Jerry L. **MAIETTA**, Plaintiff,

v.

**UNITED PARCEL SERVICE, INC.**, Defendant.

**Civ. A. No. 89–967.**

United States District Court, D. New Jersey.

Oct. 1, 1990.

John M. Agnello, Carella, Byrne, Bain, Gilfillan, Cecchi & Stewart, Roseland, N.J., for plaintiff.

Jay D. Fischer, Proskauer Rose Goetz & Mendelsohn, Clifton, N.J. and Allen I. Fagin, Proskauer Rose Goetz & Mendelsohn, New York City, for defendant.

## ORDER

LECHNER, District Judge.

Plaintiff Jerry L. Maietta ("Maietta") brings this action against his former employer, United Parcel Service, Inc. ("UPS"). Maietta alleges diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). It appears jurisdiction is appropriate.

Maietta filed his complaint on 8 March 1988 and amended it twice. His Second Amended Complaint and Jury Demand (the "Second Amended Complaint") alleges eight causes of action against UPS under New Jersey Law common and statutory law.

Count One ("Count One") of the Second Amended Complaint alleges the UPS Policy Book ("Policy Book") constitutes a UPS employment contract with Maietta and limits the right of UPS to terminate Maietta's employment. Maietta alleges his unjust and wrongful discharge violated the terms of the Policy Book. Count Two ("Count Two") alleges Maietta's superiors made representations to Maietta that he would not be terminated without just cause. Maietta alleges his discharge breached the terms of the oral contract created by these oral representations. Count Three ("Count Three") alleges the circumstances of his interview with UPS investigators prior to his discharge constituted false imprisonment. Count Four ("Count Four") alleges the conduct of UPS management officials during the investigation leading up to his discharge and through the date he was terminated constituted the intentional infliction of emotional distress. Finally,[1] Count Eight ("Count Eight") alleges Maietta was discharged because of his Italian heritage in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1, *et seq.*

UPS moves for summary judgment on the Second Amended Complaint (the "UPS

---

1. In light of UPS' Motion and supporting papers, Maietta voluntarily dismissed the Sixth and Seventh Counts of his Second Amended Complaint. Maietta Brief at 1. He also stated he was dismissing the Fourth Count. *Id.* However, Maietta opposes summary judgment of Count Four in his brief, but not of the Fifth Count. Maietta inadvertently stated he was voluntarily dismissing the Fourth Count; he voluntarily dismissed the Fifth Count. This was confirmed by his attorney at oral argument.

Count Five of the Second Amended Complaint had alleged the negligent infliction of emotional distress. Count Six had alleged malicious, false and derogatory statements made by UPS officials to prospective employers constituted tortious interference with Maietta's economic advantage. Count Seven had alleged UPS officials defamed Maietta.

**1348**

Motion") pursuant to Fed.R.Civ.P. 56.[2]

**2.** In support of its Motion, UPS has submitted: Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment; Defendants Statement of Material Facts As To Which There Is No Genuine Dispute (the "UPS Rule 12G Statement"); the Affidavit of Allen I. Fagin, Esq., ("Fagin") In Support of Defendant's Motion for Summary Judgment (the "Fagin Aff."); excerpts from the Maietta deposition, attached as Exhibit A to the Fagin Aff. (the "Maietta Dep."); Affidavit Of Calvin Darden ("Darden") In Support Of Defendant's Motion For Summary Judgment (the "Darden Aff."); excerpts from the Policy Book, attached as Exhibit A to the Darden Aff. (the "Policy Book"); notes by Barry Brown of interviews with Gustave Nicolai, Ray Younghans, James Grover, Paul Coleman, Brian Noonan, Art Washington, Frank Romeo, Dominic Falcone, Frank Perrone, Dennis Fitzsimmons, implicating Maietta in the falsification of documents and attached as Exhibit B to the Darden Aff. (the "Implication Notes"); the written statement of James Kemp ("Kemp"), implicating Maietta in the falsification of documents and attached as Exhibit C to the Darden Aff. (the "Kemp Statement"); the written statement of Ralph A. Llano ("Llano"), implicating Maietta in the falsification of documents and attached as Exhibit D to the Darden Aff. (the "Llano Statement") (the Implication Notes, the Kemp Statement and the Llano statement are collectively referred to as the "Implication Statements"); the Affidavit Of Gerald H. Barbillon In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of Brendan Byrne In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of Julio Castellanos In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of Howard Clarke In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of Elliot E. Coley In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of Patrick F. Dolan In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of Edward J. Eickhorst In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of John Evans In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of Robert Ferry In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of Philip T. Foster, Jr. In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of Harold T. Greenfield In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of Peter L. Inglese In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of Richard A. Lezott In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of Robert A. Nesnay In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of James Nowotny In Support Of Defendant's Motion For Summary Judgment; the Affidavit Of James E. Reynolds In Support Of Defendant's Motion For Summary Judgment; the Reply Memorandum In Support Of Defendant's Motion For Summa-

For the following reasons, the UPS Motion

ry Judgment (the "Reply Memorandum"); the Affidavit Of Daniel E. Preble In Support Of Defendant's Motion For Summary Judgment (the "Preble Aff."); the UPS People Workshop Instruction Guide, attached as Exhibit A to the Preble Aff. (the "People Workshop Guide"); the Affidavit of Frank A. Lupo In Support Of Defendant's Motion For Summary Judgment (the "Lupo Aff."); the Reply Affidavit Of Allen I. Fagin In Support Of Defendant's Motion For Summary Judgment (the "Fagin Reply Aff."); excerpts from the Maietta Dep., attached as Exhibit A to the Fagin Reply Aff.; excerpts from the transcript of the Darden deposition, attached as Exhibit B to the Fagin Reply Aff. (the "Darden Dep. I" for the first volume of the transcript, dated 24 July 1989, the "Darden Dep. II" for the second volume of the transcript, dated 28 July 1989, and the "Darden Dep. III" for the third volume of the transcript, dated 27 October 1989); excerpts from the transcript of the Kemp deposition, attached as Exhibit C to the Fagin Reply Aff. (the "Kemp Dep."); excerpts from the transcript of the Llano deposition, attached as Exhibit D to the Fagin Reply Aff. (the "Llano Dep."); the Policy Book, attached as Exhibit E to the Fagin Reply Aff.; a Case Management Order signed by U.S. Magistrate Ronald J. Hedges on 29 September 1989, attached as Exhibit F to the Fagin Reply Aff. (the "29 September 1989 Order"); a 26 September 1989 letter-agreement signed by Fagin and John M. Agnello ("Agnello"), counsel for Maietta, agreeing to guidelines for the redaction of documents produced by UPS for Maietta, attached as Exhibit G to the Fagin Reply Aff. (the "26 September 1989 Letter–Agreement"); and a 26 October 1989 letter from Arbitrator J.J. Pierson to Agnello and Fagin stating that redactions of produced documents conform to the terms of the 26 September 1989 Letter–Agreement, attached as Exhibit H to the Fagin Reply Aff.

In opposition to UPS' Motion, Maietta has submitted: Plaintiff's Brief And Appendix In Opposition To Defendant's Motion For Summary Judgment (the "Maietta Brief"); excerpts from the Darden Dep. I, attached as Exhibit 2 to the Maietta Brief; excerpts from the Darden Dep. II, attached as Exhibit 3 to the Maietta Brief; excerpts from the Darden Dep. III, attached as Exhibit 4 to the Maietta Brief; Plaintiff's Statement Pursuant To Local Rule 12G, attached as Exhibit 1 to the Maietta Brief (the "Maietta Rule 12G Statement"); the Policy Book, attached as Exhibit 1 to the Maietta Rule 12G Statement; Maietta's Management Evaluation and Development forms dated 11 October 1971, 2 October 1972, 10 July 1974, 1 July 1975, 2 July 1976, 7 July 1978, 9 September 1979, 16 September 1980, 14 August 1981, attached as Exhibits 2 through 10, respectively, to the Maietta Rule 12G Statement (collectively, the "Management Evaluations"); Maietta's Management Development Performance Appraisal forms for the periods ending December 1982,

for summary judgment is granted as to Counts One, Two, Three, Four and Eight, the remaining counts in the Second Amended Complaint.

*Facts*

The Maietta causes of action arise out of his termination from UPS for falsifying reports after having worked for UPS for more than twenty-one years and out of the events leading up to his termination.

### A. Structure and Organization of UPS and the Metro Jersey District

UPS is a company incorporated under the laws of the State of New York. Second Amended Complaint at 1. It is in the business of small parcel pick-up and delivery service for commercial and residential customers in the United States and more than 175 foreign countries. Darden Aff., ¶ at 2. It is organized by geographic regions; each region is divided into districts. Darden Aff., ¶ 2; Maietta Aff., ¶ 11. The Metro Jersey District (the "District") is one of five districts in the East Region. The District is comprised of four package delivery divisions and three hub divisions, each supervised by a Division Manager. Darden Aff., ¶¶ 2, Maietta Aff., ¶¶ 11, 12.

Each package delivery division in the District is comprised of four or five package centers which serve particular communities within the District. Each hub division functions on three "sorts," or shifts: the Day, Twilight and Midnight sorts. Darden Aff. at 3; Maietta Aff., ¶¶ 12, 13. Each sort employs a simulator, a person who monitors the flow of packages into and through the Hub and who prepares reports recording the total number of pack-

ages processed during that sort (the "Volume Reports"). Darden Aff., ¶ 4.

According to Maietta,[3] UPS stock is owned by UPS supervisors and managers or their heirs. Full-time supervisors and managers are eligible to receive shares of UPS stock each year as an incentive. Each year all full-time supervisors and managers are evaluated by their superiors. Based upon that evaluation, the superior recommends or does not recommend the reviewed supervisor or manager receive the stock incentive. Any stock given to supervisors and managers is in addition to salary. Maietta Aff. at 9, n. 5. The amount of the stock incentive given to managers is double that given to supervisors. Maietta Aff. at 10, n. 6.

### B. Maietta's Employment History

Maietta began working in the District as a part-time supervisor at the Englewood Center in 1967 while he was attending college. Maietta Aff., ¶¶ 14, 15; Maietta Dep. at 159. At the time, he was also working part-time at Intradata Systems. He rejected Intradata System's offer of full-time employment and continued to work part-time for UPS. Maietta Dep. at 158–59, 167.

Maietta became a full-time Supervisor of Industrial Engineering at the Englewood Center in 1968. He did not sign an employment contract with UPS for a specific time period upon becoming a full-time employee. Maietta Dep. at 124. During his years at UPS, Maietta never looked for employment elsewhere, never submitted an application for employment to any other employer and never received a job offer from any other employer. Maietta Dep. at 190.[4]

---

January 1984, January 1985, January 1986, and December 1987, attached as Exhibits 11 through 14 and 18, respectively, to the Maietta Rule 12G Statement (collectively, the "Performance Appraisals"); excerpts from the People Workshop Guide, attached as Exhibits 15, 16 and 17 to the Maietta Rule 12G Statement; Maietta's Employee Separation Form, attached as Exhibit 19 to the Maietta Rule 12G Statement; and the Affidavit Of Jerry L. Maietta In Opposition To Defendant's Motion For Summary Judgment (the "Maietta Aff.").

3. It appears Maietta's assertions about management stock ownership are within his competence and thus admissible. Moreover, his assertions are not contradicted by UPS.

4. Maietta testified in deposition:
 Q. During the time you were employed with UPS, did you look for work elsewhere?
 A. No.
 Q. Did you ever submit an application to any other employer during the time you were employed?
 A. No.

Maietta was promoted and transferred into a number of different positions at UPS in the ensuing years. These positions included positions as the Meadowlands Day Hub Manager from 1972 to 1976, Maietta Aff., ¶ 37, 38, On Car Supervisor at the Hackensack Center from 1976 to 1978, Maietta Aff., ¶¶ 51, 53, Package Center Manager of the North Bergen Center from 1982 to 1986, Maietta Aff., ¶¶ 63, 86, Center Manager of the Clifton Center from 1986 to February 1988, Maietta Aff., ¶ 87, and Midnight Hub Manager at the Meadowlands from February to August 1988, Maietta Aff., ¶ 88, 92. Maietta was working as the Center Manager of the Newark Center when his employment with UPS was terminated on 8 November 1988. Maietta Aff., ¶ 92, 117.[5]

### C. Policies and Procedures at UPS

UPS maintains a Policy Book setting forth policy, goals and procedures. The current edition of the Policy Book has been in effect since March 1983. Darden Aff., 4–5. A section entitled "Our Policies" describes the contents of the Policy Book as follows: "This book contains the policies we have developed to guide us toward our objectives. Some of the policies might accurately be described as ideals, others as procedures or rules." Policy Book at 12. The Policy Book refers the reader to other materials supplementing the Policy Book, such as the Guidelines for Antitrust Compliance and the Personnel Guide, among others, for guidance with respect to specific situations that might arise. Policy Book at 13. It also states that managers are delegated broad decision-making authority. Policy Book at 19.

The Policy Book contains a Policy entitled: "We Treat Our People Fairly and Without Favoritism" (the "Fairness Policy"). The Fairness Policy provides: "We believe that impartiality is the foundation of a loyal, cooperative work group. We want to treat each of our people as an individual. At the same time, we endeavor to treat all fairly and equally well." Policy Book at 33. The Policy Book also includes a policy entitled: "We Insist Upon Integrity in Our People" (the "Integrity Policy"). The Integrity Policy provides in relevant part:

> We expect honesty from our people in their handling of the substantial amounts of money, merchandise, and property

---

Q. Did you ever receive a job offer from any other employer during the time you were at UPS?
A. No.

Maietta Dep. at 190.

Maietta contradicts this testimony in his affidavit submitted to defeat summary judgment. He stated in his affidavit he gave up a number of job opportunities in reliance on the representations of job security he maintains UPS gave him. Among these was an offer for a job in Sea Land's engineering department, received in 1969, an offer of a management position with Federal Express, received in 1982 and an offer from Emerson Radio for a position managing their warehouse, received in 1985. Maietta Aff., ¶¶ 96–97.

Maietta offered by way of explanation for the discrepancy that he misunderstood the line of questions which produced these responses as referring to offers received in response to job searches initiated by him.

In addition to this instance, *see* discussion concerning attempts to change testimony previously given under oath, *infra,* at 1351 and n. 6; 1353 and n. 12; 1354 and n. 13 and n. 14; 1355–1356 and n. 16, n. 17 and n. 18; and 1357–1358 and n. 22 and n. 23. *See also infra,* at 1359–1360.

**5.** Maietta submitted fourteen yearly Management Evaluations. *See supra,* at 1347 n. 1. His submitted Management Evaluations for the years 1971 to 1981 utilize a five-prong scale consisting of Poor, Fair, Good, Excellent, and Exceptionally Outstanding. In the submitted Management Evaluations for 1971 to 1979, Maietta's performance was appraised as Good to Excellent. In the Management Evaluations for 1980 and 1981, Maietta's performance was appraised as Fair to Excellent.

Between 1982 and 1986, UPS replaced its Management Evaluations with the Performance Appraisals. Maietta submitted four Performance Appraisals for 1982 through 1985. Maietta states his performance was appraised during those years as above average to unusually effective (the highest rating). Maietta Aff., ¶ 70.

Maietta first received a stock incentive in 1969. Maietta Aff., ¶ 34. He also received stock incentives for the years 1972 to 1976, Maietta Aff., ¶ 38; 1976 to 1978, Maietta Aff., ¶ 53; 1978 to 1978, Maietta Aff., ¶ 58; 1980 to 1981, Maietta Aff., ¶ 62; 1982 to 1986, Maietta Aff., ¶ 70; and 1987. Maietta Aff., ¶ 87.

with which they are entrusted. *We insist on integrity in preparation of all reports.*

\* \* \* \* \* \*

The great majority of our people are of high moral character. However, *when we do discover a dishonest person in our organization, we deal with that individual quickly and firmly.*

Policy Book at 42 (emphasis added).

Maietta was first shown the Policy Book in 1967 during his initial job interview with Bob Jackson ("Jackson"), at which time he was told he would be responsible for upholding the policies of the company. Maietta Dep. at 163–64. He and Jackson engaged in no further discussion about the Policy Book at that time.[6] Maietta alleges during the course of his employment with UPS, three different superiors referred to the Policy Book as his employment contract. Maietta Dep. at 130–31. Maietta says Jackson referred to the Policy Book as a contract of employment, as did Darden. Maietta Dep. at 131.[7] Maietta also says Frank Foley told him the Policy Book is a contract of employment in around 1971. Maietta Dep. at 130. Maietta contends he was told by Darden that "[a]nyone who violated the contract, the policy book, would no longer be allowed to work for United Parcel Service." Maietta Dep. at 186.

Maietta claims representations as to job security were made by his superiors during the course of his employment. Maietta says he was told by one superior, Frank Foley, in around 1971 that if he did not break the rules he would always have a job at UPS. Maietta Dep. at 130–31. He alleges Darden told him on numerous occasions, "you'll never have to worry about losing your job. You just keep doing what you're doing. You work as hard as you work, you'll never have to worry about getting fired from UPS." Maietta Dep. at 180. Maietta also contends Darden additionally told him he would never lose his job except for good cause. Maietta Dep. at 185. Finally, Maietta alleges Darden announced at a meeting attended by supervisors and managers in April 1986 that management employees could be terminated for discrimination, fraternization, violations of the Integrity Policy and poor performance. Maietta Aff., ¶ 83;[8] Darden Aff., ¶ 7; Darden Dep. I at 98–101.[9]

**6.** Maietta stated in deposition he was not given the Policy Book or any other manual as a part-time supervisor. Maietta contradicted this testimony in his affidavit, stating: "[A]t the time I started working for UPS, Jackson gave me his copy of the UPS Policy Book ... and told me to review it carefully. I took Jackson's Policy Book and studied it carefully." Maietta Aff., ¶ 15.

*See supra,* at 1350 n. 4 for a list of references to other instances in which Maietta changed previously sworn testimony. *See also infra,* at 1359–1360.

**7.** Maietta does not state when it was that Jackson and Darden made such representations.

**8.** Maietta maintains that Darden stated UPS management employees could be terminated for those four infractions only. Maietta Aff., ¶ 83.

**9.** Maietta added in his affidavit:

"[E]very Manager to whom I reported told me at one time or another and in one way or another, that my relationship with UPS would always be secure since I was more than just an employee. I was told that I was a partner in a growing and successful organization and that I would always be treated fairly and that

I would always have a job with UPS so long as I performed my job and did not violate the provisions of the Policy Book. Moreover, even if I were to inadequately perform my job or violate the Policy Book, I was assured that such conduct would not result in termination unless my conduct could not be corrected through the imposition of progressive discipline." Maietta Aff., ¶ 35.

"While I was an On Car Supervisor, I attended Monthly Center Manager's meetings.... At each monthly meeting, a particular policy was discussed.... I was led to believe at those meetings, as well as during my numerous discussions with my managers, that the Policy Book and the practices that flowed and/or evolved from the Policy Book were designed to protect me." Maietta Aff., ¶ 54.

"During the time that Henke was Division Manager, he embarrassed me in front of other employees after a Center Managers' meeting I retaliated by answering him back. Henke then told me to report to his office 'now'. When I arrived at his office, Henke was in the process of filling out a Clearance Slip (Termination Statement) and told me I was being terminated.... I told him that he could not terminate me because I had not violated any

Maietta alleges he received additional oral representations regarding the procedures for implementing the Fairness Policy and additional oral representations of job security at a three-day training course entitled the "People Workshop" which he attended in 1983. Maietta Aff., ¶ 71. He alleges the lesson plan of the People Workshop was drawn from the People Workshop Guide and he submitted excerpts from "Fairness" section of the Guide. *See* Maietta Aff., ¶ 72. UPS submitted the entire Fairness section. Reply Memorandum at 19 n. 17.

The cover sheet of the People Workshop Guide contains the inscription "Instr. Guide." The "Overview" section describes the objective of the People Workshop as the "consistent and proper application of our 'People' policies". People Workshop Guide, Overview at 1. It lists as the topics to be covered (1) Communicating With Our People, (2) Recognizing Our People and (3) Treating Our People Fairly. Under number (3), the People Workshop Guide notes: "The PROCESS of disciplining an employee might vary from one area to another because of labor agreement differences, etc." People Workshop Guide, Overview at 2.

The "Fairness" section begins with a subsection entitled "Fairness in Treating People Slide Presentation." It is an instructor's guide to a slide presentation of a cartoon, in which poor performance by Paul Parcel, a fictional UPS package car driver covered by the terms of UPS' collective bargaining agreement with the Teamsters Union, is corrected through the cooperative intervention of management and labor. *See* People Workshop Guide, Fairness in Treating People Slide Presentation at 2–4; Preble Aff., ¶ 9.

The second subsection entitled "Fairness in Treating People" begins with an employee opinion survey, wherein 68% of managers and supervisors felt discipline is handled fairly at UPS, contrasted with 34% of hourly workers. The People Workshop Guide then comments: "[T]here's a wide difference between what we believe we practice and what the other person on the receiving end believes we practice." People Workshop Guide, Fairness in Treating People at 1.

The Fairness in Treating People section lists among its goals the fair administration of discipline. Fair administration of discipline is in part described as using discipline only as a last resort. *See* People Workshop Guide, Fairness in Treating People at 2. It instructs the reader to consider before resorting to discipline whether he or she has involved everyone who might have an influence on the employee, including other management people, union officials and fellow workers. People Workshop Guide, Fairness in Treating People at 3. It then describes progressive discipline, including verbal warnings, warning notices, suspensions and discharge. People Workshop Guide, Fairness in Treating People at 4–6. It asks with respect to the suspension and discharge stages: "Have requirements been met with regard to labor agreement, EEOC, NLRB, etc.?" People Workshop Guide, Fairness in Treating People at 5–6.

Maietta alleges that at the People Workshop, "the various 'People' policies were reviewed with particular emphasis being paid to 'treating all employees fairly.'" Maietta Aff., ¶ 71. He further alleges: "At the UPS People Workshop which I attended, the instructors reinforced the fact that UPS does not fire its managers without cause, but instead, UPS is committed to work with its managers and its hourly employees to correct any problems the

policy contained in the Policy Book and that progressive discipline had to be used prior to discharge. Henke agreed with me, rescinded his statement, tore up the Clearance Slip and took no other action. This incident reinforced the representations made to me by my previous managers that I could not be terminated unless I violated a UPS policy and then only after progressive discipline had failed." Maietta Aff., ¶ 65.

Maietta argues in his Brief: "From the outset of his employment, Maietta was told and understood that the Policy Book constituted a contract of employment with UPS and that his employment could not be terminated except for good cause (defined as inadequate job performance or violation of UPS policy) and even if good cause existed, only after all attempts at progressive discipline had failed." Maietta Brief at 3–4. This statement is unsworn.

employee is having with performance or in abiding by the policies. Moreover, the instructors confirmed that UPS' practice and procedure is to employ progressive discipline and resort to discharge only when all of UPS' rehabilitative efforts are defeated." Maietta Aff., ¶ 78.

### D. The Fall 1988 Integrity Investigation and Maietta's Discharge

In September 1988, at the end of a year-long period in which at least five managers and supervisors were fired or resigned after having falsified production records, Cal Darden ("Darden"), the District Manager of the Metro Jersey District, learned that such Integrity Policy violations were a continuing problem within the District. Darden Aff., ¶ 6. He therefore asked Barry Brown ("Brown"), the Manager of the District's Loss Prevention Department (which handles internal security for UPS) to conduct an investigation (the "Integrity Investigation"). Darden Aff., ¶ 6.

During October and November 1988, Loss Prevention Department personnel (the "Investigators") interviewed more than seventy UPS supervisors and managers to determine what they knew about possible integrity violations within the District. Darden Aff., ¶¶ 10–12. The Investigators asked questions from a questionnaire which were aimed at eliciting information about record falsification, theft, gambling, drug abuse, favoritism and abuse of union seniority. Darden Aff. at 6. Due to space

requirements and the need for confidentiality, the interviews were conducted at hotels near District headquarters in Secaucus, New Jersey. Darden Aff., ¶ 13.

Several UPS employees interviewed during the course of the Integrity Investigation implicated Maietta in Integrity Policy violations, including the teaching of subordinates how to falsify driver timecards and directing or condoning falsification of records by those under his supervision. Darden Aff., ¶ 16.[10] Kemp and Llano had worked as simulators at different times in the Meadowlands Midnight Hub under Maietta's supervision during the summer preceding Maietta's discharge. Their written and signed statements completed during the Integrity Investigation stated Maietta had directed them to record in their Volume Reports a higher volume of packages processed during a sort than the number actually processed. *See* Kemp Statement and Llano Statement.[11]

As a result of these reports, Maietta was interviewed over a period of about three hours [12] on 18 October 1988 at the Sheraton Hotel in Hasbrouck Heights by Jerry Barbillon ("Barbillon") and Phil Foster ("Foster") of the Loss Prevention Department. Maietta Aff., ¶ 100. Maietta had only recently met Barbillon and had never before met Foster. Maietta Aff., ¶ 103. Barbillon and Foster were seated while questioning Maietta. Maietta Dep. at 62. They commenced the interview by telling him they

---

**10.** Notes taken by Brown during these interviews include information obtained from interviewees to the effect "Jerry Maietta was cheating"; "Jerry Maietta ... allowed the 'monkeying around' to exist by not saying anything"; and an interviewee "heard Jerry Maietta teaching someone (a supervisor) to [falsify company documents]". *See* the Implication Notes.

**11.** Kemp and Llano detailed in their deposition testimony how Maietta's wrongdoing occurred. Kemp testified Maietta first began directing him to falsify Volume Reports in March 1988, and that these episodes were at first sporadic. Kemp Dep. at 65, 76. By June of that year, Maietta directed him almost every day to increase the figures for the volume of packages recorded in the Volume Reports. Kemp Dep. at 79.

Llano testified Maietta began directing him to falsify Volume Reports around the day after he

became simulator in June 1988. Llano Dep. at 34. Llano testified he told Maietta to "stop with the numbers." Llano Dep. at 62.

For further discussion of Kemp and Llano deposition testimony on Maietta's report falsification activity, *see infra,* at 1363–1364.

**12.** At his deposition, Maietta read the interview start and finish times indicated on the Investigators' notes, 5:20 and 8:20, and admitted he had initialed the page on which these times appeared. Maietta Dep. at 84. He then stated in the affidavit which he submitted to defeat summary judgment that the interview lasted four hours. *See* Maietta Aff., ¶ 30.

*See supra,* at 1350 n. 4 for a list of references to other instances in which Maietta changed previously sworn testimony. *See also infra,* at 1359–1360.

were trying to find out some information and that they would like Maietta to help them. Maietta Dep. at 56.

Maietta stated at his deposition Barbillon and Foster expressed animosity and raised their voices when Maietta gave them an answer with which they did not agree. Maietta Dep. at 61. But he stated neither of them screamed or yelled or physically or verbally threatened him. Maietta also admitted they did not hit him, touch him, restrain him or physically abuse him. Maietta Dep. at 62, 66, 75.[13] Maietta was not asked if he wanted to go to the men's room (Maietta Brief at 30), however, he never asked to go and stated he was not denied the right to go. Maietta Dep. at 60. Maietta never asked to leave the room or to be left alone and was never told that he could not leave the room. Maietta Dep. at 56, 66.

At the conclusion to the interview, Barbillon handed Maietta his notes of the interview. Maietta read them and initialed each page. Maietta Dep. at 88, 93. Maietta got up to leave. Barbillon stood in the doorway and told Maietta they were not done yet. He then told Maietta that he would be suspended as a result of the investigation.

Maietta Dep. at 73. Maietta contends Barbillon's standing in the doorway was a "sign of a threat that you are not leaving;" however, he never asked Barbillon to step aside and never stated that he wished to leave the room. Maietta Dep. at 80, 81. Maietta stated in deposition: "I felt if I would have left that room, there was no way back into UPS again. I mean I was gone. You don't walk out on UPS and ever return, ever." Maietta Dep. at 81. While he did not fear for his physical safety during the interview, he stated: "I had fears for my job. I had fears that, you know, what was I doing here. I had many fears at that time sure, I did." Maietta Dep. at 78.[14] But to his recollection, no one told him that he would lose his job if he left the room. Maietta Dep. at 389.

At the close of the Integrity Investigation, Darden reviewed the file on Maietta in addition to the files of the other employees (the "Implication Files") who had been suspended. Darden Dep. III at 25. Maietta's Implication File contained the Implication Statements and the questionnaire completed during Maietta's interview in which he denied wrongdoing. Darden Dep. III at 30. Darden and others [15] together read and re-

---

**13.** Maietta reiterated this testimony during his deposition:

> Q. Were you physically abused in any way during that period of time?
> A. Physically, no, sir.

Maietta Dep. at 78. He additionally testified:

> Q. Mr. Barbillon didn't physically assault you in any way?
> A. Physically, no.
> Q. He didn't physically restrain you in any way; is that right?
> A. No, he did not.

Maietta Dep. at 80. He added:

> Q. But did you not fear for your physical safety?
> A. Physical, no.
> Q. Did Mr. Foster physically assault you in any way?
> A. No.
> Q. Did Mr. Foster physically assault you in any way?
> A. No.
> Q. Or physically restrain you in any way?
> A. No.
> Q. Did he ever threaten to use any force against you?
> A. No.
> Q. Did he ever threaten to restrain you?

> A. No.

Maietta Dep. at 81.

**14.** The Maietta Aff., submitted to defeat the UPS Motion, gives a different tenor to the interview. Maietta stated in his affidavit: "[W]hen I arrived at the hotel room, . . . I was directed to sit in a pre-assigned seat, in a dimly-lit guest room with a light shining at my face. . . . [Barbillon] continually raised his voice in a threatening manner. . . . I was never asked if I would like to take a break, get a drink of water or go to the men's room. I felt that I was trapped in the hotel room and that there was no way out. I felt paralyzed and I was afraid to move. . . . I was afraid to get up from the chair I was sitting on and I thought that Barbillon or Foster would have tried to prevent me from leaving if I had attempted to do so. . . . I was unable to leave the hotel room because Barbillon was standing in the doorway." Maietta Aff., ¶¶ 103, 105, 109, 110.

*See supra,* at 1350 n. 4 for a list of references to other instances in which Maietta changed previously sworn testimony. *See also infra,* at 1359–1360.

**15.** The submitted portion of the Darden deposition transcript does not clarify with whom Dar-

read the Implication Files. Darden Dep. III at 25. Based on the information contained in Maietta's Implication File, Darden decided to terminate Maietta's employment with UPS. Darden Aff., ¶ 8. Darden relied on Maietta's Implication File in making his decision. He never spoke directly with Barbillon or Foster about Maietta's interview. Darden Dep. II at 103.

Darden and Brown met with Maietta in Darden's office on 8 November 1988. Maietta stated in his affidavit: "When I arrived at Darden's office on November 8, Barry Brown, Metro District Loss Manager, and Darden were present. At that time, Darden advised me that I was being terminated from UPS for failure to follow UPS procedures. However even though I asked several times, he would not tell me which procedures I failed to follow." Maietta Aff., ¶ 117. Darden offered Maietta the opportunity to resign. Darden Aff., ¶ 19. Maietta states he was told if he didn't resign, Darden would tell "prospective employees [sic]" who called to inquire about him that he was terminated for violating procedures. Maietta Aff., ¶ 118. Maietta did not resign and Darden advised him his employment was terminated. Darden Aff., ¶ 19; Maietta Aff., ¶ 118–19.

Maietta stated in deposition neither Darden nor Brown abused him in anyway during this meeting. He stated Darden was seated behind his desk when Maietta arrived. Maietta Dep. at 355. He stated he didn't feel physically intimidated or fear for his safety during that meeting. Maietta Dep. at 358.

Maietta was one of fifteen management employees discharged during the Fall of 1988 for violating UPS Integrity Policy. Darden Aff., ¶ 20. He maintains he never directed anyone at UPS to falsify any UPS document or change any production or volume number. Maietta Aff., ¶ 128.

### E. Post–Termination

Maietta stated of his physical and emotional condition since discharge:

"[E]very time I see a UPS truck go down the road my heart stops ..., or I get sick to my stomach and flutters.... I get the same feeling right now, rejected by some, some love somewhere where your heart stops and you get sick to your stomach.... I wake up every single morning, in the middle of the night, and think that I'm late for work."

Maietta Dep. at 376. He says he feels despondent and humiliated before family, friends and acquaintances. Maietta Aff., ¶ 139, 140; Maietta Dep. at 393, 394. He contends he is unable to sleep properly, but he has not taken sleep medication or discussed this problem with a physician. Maietta Aff., ¶ 139, 140; Maietta Dep. at 487–88.

Maietta alleges without support his "blood pressure has recently escalated to a point that doctors cannot control it with medication." Maietta Aff., ¶ 142.[16] He stated in deposition that the bursitis in his shoulder is worse since his discharge, but he did not take medication for the bursitis before his discharge and has not commenced doing so since. Maietta Dep. at 488. He has taken no medication of any kind since his discharge except his blood pressure medication. Maietta Dep. at 479. He also has not consulted with a psychiatrist, psychologist, therapist, counselor of any kind, or social worker since his discharge. Maietta Dep. at 473, 479, 480.

Maietta's work activity has been unrestricted since his discharge. Maietta Dep. at 479, 492. He and his wife opened a toy store called "Tons of Toys" in February 1989. They are the officers of Tons of Toys, which is a corporation. Maietta Dep. at 430–31. They operate the store without

---

den conferred about the Maietta Implication File. *See* Darden Dep. III at 6–30.

**16.** Maietta has not submitted an affidavit from a medical expert qualified to attest to this information. Maietta's assertion is inadmissible hearsay because Maietta is not competent to attest to such facts. *See Hlinka v. Bethlehem*

*Steel Corp.,* 863 F.2d 279, 282 (3d Cir.1988); *Baxter v. AT & T Communications,* 712 F.Supp. 1166, 1173–74 (D.N.J.1989).

For other instances in which Maietta has made unsupported allegations of fact in an attempt to defeat summary judgment, *see* discussions, *infra,* at 1358, 1365, 1367–1368 and 1369–1370.

part-time help, performing all tasks including sales, stocking shelves and unpacking deliveries. Maietta Dep. at 439, 450. The store is open from 10:00 to 6:00 four days a week and 10:00 to 9:00 two days a week. Maietta Dep. at 437. He and his wife divide the hours required in the store during and after business hours, although he spends more time there than she does. Maietta Dep. at 437, 438, 451.

Other than sleep,[17] there is nothing Maietta was able to do before his discharge which he is now unable to do. Maietta Dep. at 484–85. There are no community organizations and clubs or community and civic activities which he participated in prior to his discharge in which he is no longer able to participate. Maietta Dep. at 510. He attends weekly services at the Church of the Good Shepherd in Midland Park and is an active member of the church and elected member of the Vestry. Maietta Aff., ¶ 7.[18]

### F. Discrimination on the Basis of National Origin

Maietta testified in deposition that while he does not know whether he was discharged because he is of Italian descent, he thinks it is possible, given that "they never told [him] why [he] was discharged." Maietta Dep. at 25. He testified Frank Foley, his division manager from 1970 to 1972, told him that he was lucky to have gotten promoted as soon as he was because "this company is not fond of Italian descendant people.... because of [their] ties with organized crime...." Maietta Dep. at 8, 18. *See also* Maietta Aff., ¶ 135.[19]

To demonstrate the existence of UPS' alleged discriminatory practices, Maietta

testified he never saw Italian people get ahead at UPS, although he acknowledged that Joe Aquino, Anthony Palmisano and Frank Urso are all of Italian descent and all moved ahead. Maietta Dep. at 13–14. He testified Frank Bartlett, Bob Perette and Frank Urso complained to him there were too few Italians who were hired and promoted by UPS, although such complaints were most recently voiced in 1982. Maietta Dep. at 37, 39; Maietta Aff., ¶ 135. He states: "At various times during my employment with UPS, I was disparagingly referred to as a 'WOP' or 'Guinea.'" Maietta Aff., ¶ 134. He does not identify, however, by whom such statements were made or when.

Maietta stated in deposition he could think of no management officials of UPS who made negative comments or innuendos regarding his Italian descent. Maietta at 12. Nor, Maietta testified, did any managerial employee of UPS ever express to him, in words or substance, the view that there were too many Italians employed by UPS. Maietta Dep. at 40. Furthermore, with respect to his discharge, Maietta testified as follows:

Q. Did anyone at UPS ever tell you that you were being fired because of your Italian descent?

A. No.

Q. Did anyone at UPS ever suggest to you that was a possible reason?

A. No.

Q. Did you hear anyone at UPS discuss your Italian descent in connection with your discharge or the investigation that led to it?

A. No.

---

**17.** With regard to his complaint of difficulty sleeping, there is nothing on the record beside his assertion to support the allegations. As mentioned, Maietta has not sought a professional diagnosis or professional help relative to this complaint.

**18.** In contrast to this testimony, Maietta stated in his affidavit submitted to defeat summary judgment: "The anxiety and distress I feel over being falsely accused of wrongdoing and from being terminated from my position with UPS has affected every facet of my life. It is difficult

for me to function normally on a day-to-day basis as a result of the grief I feel." Maietta Aff., ¶ 143.

See *supra*, at 1350 n. 4 for a list of references to other instances in which Maietta changed previously sworn testimony. *See also infra*, at 1359–1360.

**19.** Maietta does not give a date for when Foley made this statement but states it was made around the time he become hub manager. Maietta Aff., ¶ 135. It appears he first worked as a hub manager in 1972. Maietta Aff., ¶ 37.

Q. Did anyone at UPS ever tell you in words or in substance that your Italian descent was a factor in your discharge?

A. No.

Q. Or a possible factor in your discharge?

A. No, they haven't.

\* \* \* \* \* \*

Q. Were there other employees who were not of Italian descent who were fired at the same time as you were?

A. I guess so. Yes.

Maietta Dep. at 28–29. According to Darden, the decision to terminate Maietta's employment was based solely on information obtained during the Integrity Investigation that Maietta had violated the Integrity Policy by falsifying reports and failed to follow required rules and procedures. Darden Aff., ¶ 22.

In his affidavit submitted to defeat summary judgment, Maietta adds to the above allegations the contention that the plurality of employees terminated as a result of the Integrity Investigation were of Italian descent. Maietta Aff., ¶ 137. He also contends: "On information and belief, Glenn Henry took over my job responsibilities as Newark Center Manager subsequent to my discharge...." Maietta Aff., ¶ 138. Maietta does not state the basis for his assertion regarding the national origin of those discharged. Maietta's allegation that based on information and belief he was replaced by Glenn Henry is without weight. Both statements are inadmissible to create

triable issue. *See Hlinka,* 863 F.2d at 282.[20]

In opposition to summary judgment on Count One, Maietta argues the Policy Book constituted his contract of employment with UPS and the manner in which he was discharged violated the Policy Book's Fairness Policy. Maietta Brief at 6–7. The Fairness Policy, he asserts, "when viewed in the context of a termination, is equivalent to a commitment that [his] employment could only be terminated for good cause." Maietta Brief at 7. He contends he was thereby given the "comfort of knowing that UPS had agreed to restrict what would otherwise have been its unfettered right, in an at-will employee relationship, to terminate [him] with or without cause or in a 'fair' or 'unfair' manner." *Id.*

Maietta asserts UPS was obligated by the Fairness Policy to implement termination procedures which allowed Maietta to be shown proof warranting his suspension, afforded him an opportunity to confront his accusers, allowed him the opportunity to respond to the accusations against him,[21] permitted him to speak with his Division Manager and subjected him to progressive discipline before being suspended. Maietta Brief at 14. Maietta maintains his summary dismissal by UPS violated the Fairness Policy.

Maietta also contends the UPS People Workshop Guide is among the materials referred to by the Policy Book as supplementary material.[22] *See supra,* at 1350.

---

**20.** See *supra,* at 1355 n. 16 for a list of references to other instances in which Maietta has made unsupported factual allegations to create an issue of material fact and to defeat summary judgment.

**21.** Maietta states that he was "not afforded an opportunity to respond to the acquisitions [sic] against him...." Maietta Brief at 14. Presumably, Maietta meant to say "accusations" rather than "acquisitions."

**22.** Maietta stated both in his Second Amended Complaint and repeatedly at deposition that the alleged written contractual terms upon which he relies are contained in the Policy Book alone. His testimony at deposition includes the following:

Q. Mr. Maietta, would you tell me what document or documents constitute the written

contract of employment that you claim you had with UPS?

A. The policy book.

Maietta Dep. at 103. He also testified that to his recollection, the only document which made representations as to job security or job tenure was the Policy Book. Maietta Dep. at 182.

In the Maietta Aff. and Brief submitted to defeat UPS' Motion, however, he takes the position that the People Workshop Guide sets forth the practices and procedures implementing the Policy Book's Fairness Policy and permits UPS to terminate employees for cause only. Maietta Aff., ¶ 71–78; Maietta Brief at 3–4.

*See supra,* at 1350 n. 4 for a list of references to other instances in which Maietta changed previously sworn testimony. *See also infra,* at 1359–1360.

He maintains that as such, the policies in the People Workshop Guide are binding on UPS. ` He argues that because the People Workshop Guide requires an employee to be subjected to progressive discipline prior to being terminated and because he did not receive progressive discipline prior to his discharge, his discharge constituted a breach of his employment contract. *See* Maietta Brief at 7–11.[23]

In opposition to summary judgment on Count Two, Maietta maintains several superiors made a number of oral representations to him which limited UPS' right to terminate him. Maietta asserts it was represented to him that he would not be terminated except for cause. He alleges it was also represented to him that he could not be terminated except for committing four infractions consisting of discrimination, fraternization, violation of UPS Integrity Policy, and poor performance. Finally, he alleges he was told he would not be terminated except if he were to deviate from the Policy Book. He argues these representations are binding on UPS, in that he rejected other employment opportunities in reliance on these oral representations. *See* Maietta Brief at 19–22.

In opposition to summary judgment on Count Three, Maietta argues Barbillon and Foster falsely imprisoned him during his Integrity Investigation interview because as a result of the Investigators' words and conduct, he "thought the interrogators would have tried to prevent him from leaving the hotel room", and he "felt trapped and paralyzed." *See* Maietta Brief at 23–25.

In opposition to summary judgment on Count Four, Maietta argues the Investigators' conduct during his Integrity Investigation interview and the manner in which he was discharged were outrageous and constituted the intentional infliction of emotional distress. Maietta asserts he has suffered severe emotional distress as a result.

In opposition to summary judgment on Count Eight, Maietta maintains he presents a prima facie case of discrimination based on national origin in that he is a member of a protected group; he was terminated from a job for which he was qualified; and his job was filled by "an individual not belonging to the protective [sic] class." Maietta Brief at 30–31. The Maietta Brief also makes the allegation that seven of the fifteen individuals terminated are of Italian descent and that this disparate impact upon Italians is further evidence of unlawful discrimination against Maietta.

For the following reasons, UPS' Motion for summary judgment is granted as to all remaining counts of the Second Amended Complaint.

*Discussion* [24]

A. Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must establish there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The district court's task is to determine whether disputed issues of fact exist, but the

---

**23.** Maietta also seems to assert his contract with UPS arises because of his stock ownership, Maietta Dep. at 104–05, and that when UPS terminated his employment, it violated the promise of job security implied by UPS' issuance of stock to him. Maietta maintains the "package of job securities" provided to its managers includes "the ownership of stock in a manager-owned company, which makes UPS managers 'partners' in the business". Maietta Brief at 6. He also asserts: "The concept an employer's undertaking the obligation to be 'fair' with its employees as being a form of job security is enhanced when viewed in the context of UPS' corporate structure." Maietta Brief at 11. He argues: "This corporate undertaking was viewed by Maietta as part of the job securi-

ty provided to him under the UPS Policy Book." Maietta Brief at 12.

It is not clear whether he alleges the representation of job security implied by the issuance of stock is a written representation or an oral representation. However, no documents have been submitted to support the allegation.

**24.** In diversity actions, federal courts determine the substantive law to be applied by looking to the choice of law rules of the forum state. *Van Dusen v. Barrack*, 376 U.S. 612, 645–46, 84 S.Ct. 805, 824, 11 L.Ed.2d 945 (1964); *Klaxon v. Stentor Electronic Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Petrella v. Kashlan*, 826 F.2d 1340, 1343 (3d Cir. 1987). In the instant case, neither party disputes that New Jersey law applies.

court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). *See also Todaro v. Bowman*, 872 F.2d 43 (3d Cir. 1989); *Joseph v. Hess Oil*, 867 F.2d 179, 182 (3d Cir.1989).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted).

The court elaborated on the standard in *Anderson:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted). Thus, once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing the need for trial. *See* Fed.R.Civ.P. 56(e). *See also Aronow Roofing Co. v. Gilbane Building Co.*, 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case.").

### B. Affidavits Inconsistent with Deposition Testimony Submitted to Defeat Summary Judgment

■ A party may not create a genuine issue of material fact to prevent summary judgment by submitting an affidavit of a witness which contradicts that witness' prior sworn testimony. *See Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 705 (3d Cir.1988); *Vanguard Telecommunications, Inc. v. Southern New England Telephone Co.*, 722 F.Supp. 1166, 1170 n. 2 (D.N.J.1989), *aff'd*, 900 F.2d 645 (1990). This rule does not apply where the witness was confused or misspoke while giving the earlier testimony and subsequently seeks to correct or clarify that testimony. *Martin*, 851 F.2d at 705; *Vanguard Telecommunications*, 722 F.Supp. at 1170 n. 2. However, the rule will apply where "the affiant was carefully questioned on the issue, had access to the relevant information at the time, and provided no satisfactory explanation for the later contradiction...." *Martin*, 851 F.2d at 706; *Vanguard Telecommunications*, 722 F.Supp. at 1170 n. 2; *Carney v. Dexter Shoe Co.*, 701 F.Supp. 1093, 1103 (D.N.J. 1988).

In *Martin*, the parents of a child with birth defects sought damages from the manufacturer of a drug and contended the drug taken by the mother during her pregnancy caused the defects. After discovery was taken, the defendant moved for summary judgment based upon the deposition of the mother, answers by plaintiffs to interrogatories and an affidavit from an expert. Plaintiffs opposed the motion with an affidavit which squarely contradicted her earlier sworn statements. 851 F.2d at 705.

The Circuit recognized the "affidavit [was] submitted only after [plaintiffs] faced almost certain defeat in summary judgment, [and that it] flatly contradicted no less than eight of [the mother's] prior sworn statements.[.]" *Id.* The court, in quoting the Second Circuit, noted:

"If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."

*Id.* at 706 (quoting *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969)).

■ In this case, Maietta submitted his affidavit after his deposition "only after [he] faced almost certain defeat in summary judgment...." *Martin*, 851 F.2d at 705. Maietta flatly contradicted no less than six of his prior sworn statements concerning: (1) his job opportunities and offers from other employers while at UPS—at deposition he said he made no such applications and had no such job offers or opportunities, his affidavit is to the contrary, *see supra*, at 1349 n. 4, (2) what he was given at the time of his first interview—at deposition he stated he was not given the Policy Book or other manual, his affidavit says he received the Policy Book and read it, *see supra*, at 1351 and n. 6, (3) the length of time he was interviewed—at deposition he said it was three hours, in his affidavit he says four hours, *see supra*, 1353 n. 12, (4) the circumstances surrounding and the conduct of the interview by UPS employees—at his deposition he said there was no coercion, force or threatening conduct, etc., in his affidavit he says otherwise, *see, supra*, at 1354 and n. 13 and n. 14, (5) his ability to function after termination—at deposition he said there was no change, in his affidavit he said there is, *see, supra*, 1355 to 1356 and n. 16, n. 17 and n. 18, and (6) the basis for his contract of employment claim—in depositions he based it upon the Policy Book alone, in his affidavit he contends it was based upon the Policy Book and the Workshop Guide, *see, supra*, at 1357–1358 and n. 22 and n. 23.

The attempt by Maietta to contradict his prior sworn statements is rejected. He was carefully questioned, he had access to relevant data and he has not provided a satisfactory explanation for these stark contradictions. *Martin*, 851 F.2d at 706. This is not a situation where the deponent misspoke or was confused. *See, e.g., Lane v. Celotex Corp.*, 782 F.2d 1526 (11th Cir. 1986). The Maietta affidavit was produced only after the UPS motion was made and only for that purpose. It does not create a genuine issue of material fact.

### C. Breach of the Policy Manual and People Workshop Guide

■ The traditional rule with respect to employment contracts has been that an employment contract for an indefinite term is presumed to be terminable at will. *Woolley v. Hoffmann–La Roche, Inc.*, 99 N.J. 284, 290, 491 A.2d 1257, *modified on other grounds*, 101 N.J. 10, 499 A.2d 515 (1985). Thus, the rule has been that an at-will employee may be terminated for any reason whatsoever, with or without cause. *Velantzas v. Colgate–Palmolive Co.*, 109 N.J. 189, 191, 536 A.2d 237 (1988). In order to convert an at-will employment contract into a contract purporting to be for permanent employment, consideration in addition to continued services must be provided by the employee. *Savarese v. Pyrene Manufacturing Co.*, 9 N.J. 595, 601, 89 A.2d 237 (1952).

In 1985, the New Jersey Supreme Court held an employer may be found to have converted the terms of employment from at-will to discharge only for good cause when the employer represents to its employees in its employee policy manual that discharge will be only for good cause. *Woolley*, 99 N.J. at 297, 491 A.2d 1257. In *Woolley*, the policy manual at issue purported to cover all employees, though it apparently was distributed only to supervisory personnel. *Id.* at 298, 491 A.2d 1257. The termination section listed the types of terminations, including layoffs, "discharge, disciplinary" and retirement, and listed no category for terminations without cause. It also listed a fairly detailed procedure to

be used before termination could take place. *Id.* at 287 n. 2, 491 A.2d 1257.

In deciding the question of the enforceability of the provisions on discharge in the policy manual, the *Woolley* court considered "the probable context in which [the policy manual] was disseminated and the environment surrounding its continued existence." *Id.* at 298, 491 A.2d 1257. The court was impressed by the fact that the employer of a large number of employees knowingly distributed an "apparently well thought-out policy manual." *Id.* at 293, 491 A.2d 1257. It held that when an employer circulates a manual providing that certain benefits are incident to employment, the judiciary "should construe [the provisions] in accordance with the reasonable expectations of the employees," *id.* at 297, 491 A.2d 1257, unless "the language contained in the manual [is] such that no one could reasonably have thought it was intended to create legally binding obligations...." *Id.* at 299, 491 A.2d 1257. The court noted, however, that the manual did not protect against all termination, but only against arbitrary termination. *Id.* at 301 n. 2, 491 A.2d 1257.

Since *Woolley*, a number of court decisions have given flesh to what features a policy manual must have for its terms to be enforceable. In *Preston v. Claridge Hotel & Casino, Ltd.*, 231 N.J.Super. 81, 555 A.2d 12 (App.Div.1989), the New Jersey Appellate Division found that a handbook distributed at an orientation meeting was a *Woolley* contract. The widely-distributed handbook purported to cover all employees, provided a step-by-step procedure for dealing with employee problems, enumerated the misconduct which might result in discharge and presented a four-step disciplinary process culminating in termination. In addition to these features, the court was especially impressed by the handbook's unequivocal representation that "[w]hile you work for the Claridge.... [y]ou will receive maximum job security." *Id.* at 86, 555 A.2d 12.

In contrast, in *Kane v. Milikowsky*, 224 N.J.Super. 613, 541 A.2d 233 (App.Div. 1988), the Appellate Division found a memorandum apparently circulated to all employees listing the misconduct which results in disciplinary action not to be a *Woolley* contract because it did not purport to cover comprehensively the subject of termination. *Id.* at 616, 541 A.2d 233.

In *Radwan v. Beecham Laboratories, Div. of Beecham, Inc.*, 850 F.2d 147 (3d Cir.1988), the Circuit found that an application for employment signed by the plaintiff clearly notified the plaintiff he might be terminated at any time without previous notice and thus constituted a disclaimer to any representations contained in the employer's policy manual. However, it held that the disclaimer aside, it was doubtful the provisions of the policy manual were enforceable. The policy manual contained no fairly detailed progressive discipline provision, no representation that the employer would attempt to remedy the employee's performance and did not purport to exhaustively enumerate grounds for dismissal. *Id.* at 151.

■■■ The UPS Policy Book did not create *Woolley* rights for Maietta. The Policy Book is a self-described collection of provisions variously described as "ideals, ... procedures [and] rules." Policy Book at 12. Of those three categories, the Fairness Policy is by its terms an ideal, stating, "[W]e endeavor to treat all fairly and equally well." Policy Book at 33. This language is such that "no one could reasonably have thought it was intended to create legally binding obligations...." *Woolley*, 99 N.J. at 299, 491 A.2d 1257. It is from the Fairness Policy that Maietta infers a host of "rights", including the right to be terminated for just cause only, the right to be confronted with the proof warranting his suspension, the opportunity to confront his accusers and other rights usually associated with the rights of an accused under the Constitution. *See* Maietta Brief at 7, 14.

Under *Woolley* and its progeny, an at-will employment relationship will be converted by a policy manual to termination only for just cause when the manual clearly and exhaustively sets forth the guidelines for such termination. These guide-

lines include the types of misconduct which might result in termination and the progressive disciplinary steps or other remedial measures the employer must take prior to discharge. In contrast, UPS' Policy Book touches on the subject of misconduct and discipline in cursory fashion, as, for example, in its statement that individuals who violate the Integrity Policy will be dealt with "quickly and firmly." Policy Book at 42. Such provisions are not meant to be an exhaustive discussion on discipline. Nevertheless, employees are on notice that violations of the Integrity Policy are serious and that there will be no delay in responding to such violations.

The Policy Book neither sets forth provisions on progressive discipline nor expressly discusses the subject of termination. The UPS Policy Book does not as a matter of law limit UPS' right to terminate an employee to termination for just cause only, as Maietta claims.[25] In any event, however, UPS had cause to terminate Maietta because of his falsification of records and violation of the Integrity Policy.

■ The Maietta Brief contends the People Workshop Guide is a "standard practice manual" which UPS uses to carry out its policies on a day-to-day basis and that it supplements the Policy Book and creates binding contractual obligations on UPS toward its employees. *See* Maietta Brief at 708. This contention is not supported by an affidavit and as such does not create a genuine issue of material fact to defeat summary judgment. *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d at 282; *Baxter v. AT & T Communications*, 712 F.Supp. at 1173–74.[26] Furthermore, "[i]t is clear enough that unsworn statements of coun-

sel in memoranda submitted to the court are even less effective in meeting the requirements of Rule 56(e) than are unsupported allegations in the pleadings." *Schoch v. First Fidelity Bankcorp.*, 912 F.2d 654, 657–58 (3d Cir.1990).

The assertion in the Maietta Brief that the People Workshop Guide is effectively part of the Policy Book and binding on UPS is controverted by the Preble Aff. Daniel A. Preble ("Preble") is UPS' National Training Manager. Preble Aff., ¶ 1. Preble establishes he developed the People Workshop Guide as a curriculum aid for the People Workshop, a workshop on communication and personnel management skills for full-time management employees. Preble Aff., ¶¶ 3, 4. He asserts it is not one of the standard practice manuals referred to in the Policy Book; rather it is a teacher's lesson plan. Preble Aff., ¶ 6. Preble maintains it is given only to senior managers who may be asked to serve as People Workshop discussion leaders in the future and that only approximately ten percent of UPS' 21,000 full-time management employees have received copies. Preble Aff., ¶ 7.

■ Even if the Policy Book and the People Workshop Guide limited UPS' right to terminate Maietta to only just cause, it is clear UPS had just cause for discharging Maietta. An employment contract providing for termination for just cause protects against "arbitrary discharge." *Shebar v. Sanyo Business Systems Corp.*, 111 N.J. 276, 287, 544 A.2d 377 (1988); *Woolley*, 99 N.J. at 301 n. 2, 491 A.2d 1257; *Linn v. Beneficial Commercial Corp.*, 226 N.J.Super. 74, 79, 543 A.2d 954 (App.Div.1988). Under such an employment contract, an

---

**25.** To the extent that Maietta asserts his receiving stock incentives constituted a representation of job security by UPS, the symbolic meaning which Maietta infers from this receipt does not contain even a residuum of the clarity of contractual terms necessary to create a *Woolley* right to be terminated for just cause. As discussed above, a written representation of job security must expressly state the conditions under which an employee may be terminate and must purport to exhaustively treat the subject of termination. The allegedly symbolic represen-

tation of job security, whereby Maietta was made a "partner" in the business, Maietta Brief at 6, does not meet these requirements.

*See supra*, at 1358 n. 23 for a description of Maietta's allegations that his receiving UPS stock constituted the company's representation of job security.

**26.** *See supra*, at 1355 n. 16 for references to discussions of other instances in which Maietta has made unsupported factual assertions to create an issue of material fact and defeat summary judgment.

employer need only make a good faith determination having credible support that good cause exists. *Vitale v. Bally's Park Place, Inc.*, No. A–228–88T5, slip op. at 3 (N.J.App.Div. 5 May 1989). *See also Baldwin v. Sisters of Providence, Inc.*, 112 Wash.2d 127, 769 P.2d 298, 303 (1989) ("'Just cause' is ... a fair and honest cause of reason, regulated by good faith on the part of the party exercising the power. A discharge for 'just cause' is one based on facts that (1) are supported by substantial evidence and (2) are reasonably believed by the employer to be true and also (3) is not for any arbitrary, capricious, or illegal reason."); *Kestenbaum v. Pennzoil Co.*, 108 N.M. 20, 766 P.2d 280, 287 (1988) (employer must have "reasonable grounds to believe that sufficient cause existed" to discharge the employee), *cert. denied,* — U.S. —, 109 S.Ct. 3163, 104 L.Ed.2d 1026 (1989).

Maietta maintains the Implication File which Darden relied on in reaching his decision to terminate him was a patently untrustworthy basis for ascertaining the existence of good cause. He argues the Implication Notes are "a summary of statements prepared by Barry Brown", they are "riddled with speculation and supposition", they are "redacted to a point of being incomplete", and contain incomprehensible non-sequiturs. Maietta Brief at 15. He also asserts that the Kemp Statement is untrustworthy because Kemp admitted on the questionnaire that he was being untruthful, and the Llano Statement is untrustworthy because "Llano had worked for Maietta for approximately two weeks out of Maietta's twenty-one career with UPS." Maietta Brief at 16.

▮ With respect to Maietta's contention that the Implication File contents were redacted to a point of being incomplete, UPS correctly points out that the contents of the Implication File were redacted pursuant to a 26 September 1989 Letter–Agreement between Maietta and UPS and a 29 September 1989 Order of Magistrate Ronald Hedges. *See* UPS Reply Memorandum at 23 n. 23; 26 September 1989 Letter–Agreement; 29 September 1989 Order. This order provided that an arbitrator

would approve redactions made by UPS of materials produced for Maietta during discovery and Maietta would then have five days to object to the redactions. The Arbitrator approved the redactions of the contents of Maietta's Implication File and it does not appear that Maietta timely objected to them. Furthermore, Darden testified he reviewed the original statements of each of the interviewees who implicated Maietta in wrongdoing before reaching his decision to terminate him. Darden Dep. III at 6–7; 20–21; 25–26.

▮ In order for there to be just cause to terminate an employee, an employer need not have certainty that the employee has engaged in wrong-doing, but need only make a good faith determination that good cause exists based on credible support. *Vitale,* No. A–228–88T5, slip op. at 3. A termination is for just cause when it was not arbitrary. *Shebar,* 111 N.J. at 287, 544 A.2d 377; *Woolley,* 99 N.J. at 301 n. 8, 491 A.2d 1257. The Implication File contained allegations from a number of sources implicating Maietta in wrong-doing. The Implication Notes support a determination of good cause, especially when viewed together with the Kemp and Llano Statements.

While Kemp answered "No" when asked on the questionnaire whether he had answered truthfully, the detailed information he gave in the preceding sections explaining how Maietta had instructed him to falsify Volume Reports while he was simulator could still form a credible basis for a determination that good cause existed to discharge Maietta. Darden testified that when he reviewed the Kemp Statement prior to deciding to discharge Maietta, he understood Kemp's answer to this question to reflect a transcription error. Darden Dep. III at 105–06. *See also infra,* at 1363–1364; Kemp Dep. at 64–87 (Kemp's sworn testimony regarding how Maietta directed him to falsify Volume Reports).

Maietta also asserts the Llano Statement is untrustworthy because he worked for Maietta for only two weeks. Llano testified in deposition that he worked for Maietta as simulator between June and Septem-

ber 1988.[27] Llano's allegation that Maietta directed him to falsify Volume Reports constitutes a credible basis for determining in good faith that good cause existed to discharge Maietta, whether he did so for two weeks or three months. The information on which Darden based his decision to terminate Maietta supported a good faith determination that good cause existed to discharge Maietta as a matter of law.

Moreover, Maietta's contentions regarding the unreliability and untruthfulness of the Kemp and Llano Implication Statements are undercut by the fact that Kemp and Llano gave strong, unequivocal deposition testimony that Maietta directed them to falsify Volume Reports. Kemp testified Maietta became his manager in January 1988. Kemp Dep. at 64. He testified Maietta first began directing him to falsify Volume Reports in March of that year and that these episodes were at first sporadic. Kemp Dep. at 65, 76. By June, Maietta directed him almost every day to increase the figures for the volume of packages recorded in the Volume Reports. Kemp Dep. at 79. Kemp understood Maietta was telling him to falsify volume figures, Kemp Dep. at 86, but he did not report Maietta's activity because he was afraid of losing his job. Kemp Dep. at 87.

Llano testified he became a simulator in June 1988 and Maietta began directing him to falsify Volume Reports on the day after he started. Llano Dep. at 34. He knew Maietta's conduct was wrong and violated the Integrity Policy. Llano Dep. at 44, 45. He did not report Maietta, however, because he was not sure "how far up this thing went." Llano Dep. at 46. Llano testified he told Maietta to "stop with the numbers." Llano Dep. at 62.

### D. Breach of an Oral Employment Contract

 The enforceability of oral contracts which convert an at-will employment contract to an employment contract providing for termination only with just cause is gov-

erned by *Shebar*. 111 N.J. at 288, 544 A.2d 377. ("To the extent that plaintiff alleges a promise of discharge for cause only, plaintiff's breach of contract claim should be analyzed by those contractual principles that apply when the claim is one that an oral employment contract exists.")

In *Shebar*, the plaintiff was employed by the defendant and tendered his resignation after deciding he was unhappy with the defendant's management practices. The president and vice-president of the employer met with the plaintiff to discuss his resignation. During this meeting, they told the plaintiff they would not accept his resignation and destroyed it in front of him. They represented to him that Sanyo does not fire its managers, and that it has never fired, and never intended to fire, a corporate employee whose rank was manager or higher. They then told him he had a job for the rest of his life. *Shebar*, 111 N.J. at 282, 544 A.2d 377. In reliance on this information, the plaintiff revoked his acceptance of a job offer from another company. He thereafter informed the defendant's vice-president of his action, and the vice-president congratulated him on his decision, telling him he was "married" to Sanyo and no divorce was allowed. About four months later, the defendant terminated the plaintiff's employment. *Id.* at 282–83, 544 A.2d 377. The plaintiff sued the defendant for breach of an oral promise to terminate him only for cause. *Id.* at 288, 544 A.2d 377.

In analyzing the plaintiff's claim, the New Jersey Supreme Court noted it need not consider whether to extend *Woolley* to company-wide policies orally communicated to its employees, because it found no basis in the record for finding an established company-wide policy. *Id.* at 288, 544 A.2d 377. The court affirmed the appellate division reversal of the trial court grant of summary judgment for the defendant because of the existence of a genuine issue of material fact as to whether plaintiff acted in reliance on the alleged promise by forgo-

---

**27.** Llano repeated his testimony that he started working as simulator at the midnight hub in June 1988. *See* Llano Dep. at 61.

ing a job opportunity at another company. *Id.* at 289, 544 A.2d 377. Furthermore, it held a factfinder could conclude the plaintiff provided valuable consideration for defendant's promise of continued employment with termination only for cause. *Id.* at 289, 544 A.2d 377. It noted: "The essential requirement of consideration is a bargained-for exchange of promises or performance ... consist[ing] of an act, a forbearance, or the creation, modification, or destruction of a legal relation." *Id.* at 289, 544 A.2d 377 (citing *Restatement (Second) of Contracts* § 71 (1981)). The bargained-for exchange consisted of the defendant's agreement to relinquish its right to terminate the plaintiff at-will and the plaintiff's agreement to relinquish his new position at another company. *Id.* at 289, 544 A.2d 377. "The enforceability of each contract will depend on the intent of the parties as established under ordinary principles of contract law." *Id.* at 290, 544 A.2d 377.

In *Shebar,* the court analyzed a representation made to an employee that it was the employer's policy not to fire managers as an oral contract of employment "specifically made to him," *id.* at 284, 544 A.2d 377, and applied general principles of oral employment contract law. *Id.* at 288, 544 A.2d 377. As in *Shebar,* Maietta asserts in the instant case that various supervisors made representations to him that he would only be fired for cause, that he would only be fired for four types of infractions and that he would only be discharged for violating the Policy Book. *See* Maietta Dep. at 130–31, 180, 185; Maietta Aff., ¶¶ 35, 54, 65, 83. Maietta asserts in his affidavit submitted to defeat summary judgment that he gave up a number of other job opportunities in reliance on these representations. Maietta Aff., ¶¶ 96–97.

Maietta's assertion in his affidavit contradicts his deposition testimony to the ef-

fect that during his years at UPS he never looked for employment elsewhere, never submitted an application to any other employer and never received a job offer from any other employer. Maietta Dep. at 190. Maietta may not create an issue of fact to prevent summary judgment by submitting an affidavit which contradicts his prior sworn testimony. *See Martin,* 851 F.2d at 705; *supra,* discussion, at 1359–1360.[28]

Maietta maintains he was confused by the questions preceding these answers, understanding them to enquire about job offers received in response to a job search initiated by him. Maietta Aff. at 27–28 n. 8. The transcript of his deposition belies this claim.[29] Assuming the truth of Maietta's assertions, however, his receipt of these job offers does not constitute the additional consideration necessary under *Shebar* to enforce an oral employment contract providing for termination for cause only. He does not assert UPS' representations were made to induce him to reject specific job offers. Therefore, the bargained-for exchange necessary to enforce an employer's oral promise to limit its right to terminate an at-will employee is not present in the instant case.

Maietta argues the facts of his case are governed by the opinion of the appellate division in *Shebar v. Sanyo Business Systems Corp.,* 218 N.J.Super. 111, 526 A.2d 1144 (App.Div.1987), *rev'd in part, aff'd in part on other grounds,* 111 N.J. 276, 544 A.2d 377 (1988). Maietta Brief at 20. The appellate division analyzed the facts of *Shebar* not as an oral employment contract claim, but as presenting the question whether oral representations of "definitive, established, company-wide employer policy" were enforceable in the same way that written representations in policy manuals were held to be in *Woolley,* 218 N.J.Super. at 120, 526 A.2d 1144.[30] The appellate divi-

---

28. *See also supra,* at 1350 n. 4 for a list of references to other instances in which Maietta changed previously sworn testimony.

29. *See supra,* at 1349 n. 4 for text of questions and Maietta's answers regarding job offers.

30. Specifically, the appellate division stated:

The legal question then is whether the holding in *Woolley* was intended by the Supreme Court to be limited to a general employer policy expressed only by way of a manual or handbook or whether it was intended to extend to a definitive, established, company-wide employer policy, however expressed. We conclude that the thrust of the *Woolley*

sion held that the form of the representation is irrelevant. *Id.* It noted, however, that a plaintiff "bears the burden of proving the existence of a company policy of non-termination ... except for cause.... [T]he oral statement of policy by ... superiors is probative only if plaintiff is able to prove that their statements constituted an accurate representation of policy *which they were authorized to make.*" *Shebar,* 218 N.J.Super. at 121, 526 A.2d 1144 (emphasis added).

To the extent representations were made to Maietta that he would not be fired except with cause, this case is governed by the New Jersey Supreme Court decision in *Shebar,* where representations to the plaintiff of a policy of non-termination of managers was treated as an oral employment contract. As mentioned above, Maietta has not as a matter of law submitted evidence of the bargained-for exchange necessary to support the enforceability of these alleged representations. Also as mentioned above, Maietta was terminated for cause for falsifying reports.

 Maietta also asserts that Darden informed supervisors and managers at an April 1986 meeting that management employees may be fired for discrimination, fraternization, violations of the Integrity Policy and poor performance. Maietta Aff., ¶ 83. He also asserts oral representations were made to him by various superiors and by instructors of the People Workshop that employees are not terminated before progressive discipline is employed. *See* Maietta Aff., ¶¶ 35, 54, 65, 78. Maietta argues these representations are enforceable because they constitute the definitive, established, company-wide policy discussed in the appellate division opinion in *Shebar.*

The precedential value of the opinion of the appellate division in *Shebar* has been mooted by the New Jersey Supreme Court opinion which expressly states: "[W]e need not consider whether to extend our decision

in *Woolley* to instances where a company has orally communicated an established company-wide policy to its employees." 111 N.J. at 288, 544 A.2d 377.[31] Accordingly, "[a]lthough [it did] so on other grounds, [it] affirm[ed] the [a]ppellate [d]ivision's reversal of the summary judgment on the breach of contract." *Id.* at 290, 544 A.2d 377. However, even if the appellate division decision is authoritative, and even if Maietta has submitted proof of an oral representation of a company-wide policy not to terminate management employees without good cause, Maietta has not as a matter of law submitted support for a breach of oral policy representations.

By the terms of the alleged oral representations, management officials could be terminated for violations of Integrity Policy. As mentioned above, UPS had formidable, credible support for the determination that Maietta violated the Integrity Policy when he falsified reports and therefore had good cause to terminate Maietta's employment. Moreover, Maietta stated in deposition that he understood he might be terminated for falsifying reports. Maietta Dep. at 760. Finally, Maietta has submitted no support for the proposition that the instructors of the People Workshop represented accurately that the policy of UPS was to implement progressive discipline prior to terminating an employee, nor has he alleged they had the authority to make such a representation. Under the appellate division opinion in *Shebar,* the burden is on Maietta to make both demonstrations. *Shebar,* 218 N.J.Super. at 121, 526 A.2d 1144.

### E. False Imprisonment

 A person is falsely imprisoned when that person's freedom of movement is constrained. The constraint may be effectuated by force or by threats of force communicated through conduct or words. *Earl v. Winne,* 14 N.J. 119, 127, 101 A.2d

---

holding and the rationale as well as the public policy on which it is based is directed to the existence of the employer's general policy rather than the form in which it is expressed. 218 N.J.Super. at 120, 526 A.2d 1144.

**31.** The opinion went on to state there was no basis in the record for such a finding. On the contrary, the court had before it "a special contract with a particular employee." 111 N.J. at 288, 544 A.2d 377.

535 (1953). But for threats to be held to be a constraint, they must be such as would "induce a reasonable apprehension of force[,] and the means of coercion [must be] at hand." *Id.* There is no jury question where the apprehension of force was not reasonable. *Id.* at 127–28, 101 A.2d 535.

In *De Angelis v. Jamesway Dept. Store,* 205 N.J.Super. 519, 501 A.2d 561 (App.Div. 1985), the court upheld a jury award for the plaintiff, a store employee suspected of stealing. The plaintiff alleged she was falsely imprisoned by a loss prevention manager during her investigatory interview. The court held the jury could have found the plaintiff was detained for four hours in the back room of the store, where she was shouted at and lectured to about theft. The seventeen-year-old plaintiff testified the loss prevention manager slammed his fist on the desk, put his face close to hers and told her she was wasting his time and getting him frustrated. *Id.* at 522, 501 A.2d 561. The court affirmed the jury award based on the "highly offensive nature" of the interview. *Id.* at 527, 501 A.2d 561.

■ Maietta asserts he was falsely imprisoned by Barbillon and Foster during his Integrity Investigation interview. He repeatedly testified in deposition, however, that he was not touched in any offensive way or restrained by either Barbillon or Foster, and that he did not fear for his safety. He also testified that they did not scream or yell or physically or verbally threaten him. *See supra,* at 1354–1355 n. 13; Maietta Dep. at 62, 66, 75, 78, 80, 81. He was not told he could not leave the room and while he was not offered the opportunity to go to the men's room, he never requested to do so. Maietta Brief at 30, Maietta Dep. at 60. He stated in clear, unequivocal terms, "I had fears for my job.... You don't walk out on UPS and ever return, ever." Maietta Dep. at 78, 81.

In an attempt to defeat summary judgment, Maietta asserted in his affidavit that Barbillon continually raised his voice in a threatening manner and that he felt that Barbillon or Foster would have tried to prevent him from leaving had he attempted to do so. *Compare* deposition testimony *supra,* at 1354 and n. 13 with affidavit statement *supra,* at 1354 n. 14. However, as mentioned previously, a party may generally not create an issue of fact to defeat a summary judgment motion by submitting an affidavit of a witness which contradicts that witness' prior sworn testimony. *See Martin,* 851 F.2d at 705; *supra,* discussion, at 1359–1360.

In the instant case, Maietta was repeatedly questioned in deposition as to the conduct of Barbillon and Foster and as to whether he feared for his safety. His testimony clearly depicted circumstances which, as a matter of law, could not have created a reasonable apprehension that Barbillon or Foster would use force. He may not now defeat summary judgment by submitting contradictory testimony in an attempt to create a genuine issue of material fact.

### F. Intentional Infliction of Emotional Distress

■ New Jersey courts have adopted the definition of the *Restatement (Second) of Torts* § 46 (1965) for the intentional infliction of emotional distress. *Buckley v. Trenton Savings Fund Soc.,* 111 N.J. 355, 544 A.2d 857 (1988); *Hume v. Bayer,* 178 N.J.Super. 310, 428 A.2d 966 (Law Div. 1981). Under this definition, the plaintiff must prove conduct by the defendant "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* 111 N.J. at 366, 544 A.2d 857 (quoting *Restatement (Second) of Torts* § 46, comment d). The act must have been done with the intent to do the act and to produce the emotional distress, or in deliberate disregard of a high degree of probability that emotional distress will follow. *Id.* The defendant's actions must have been the cause of the emotional distress, and the distress must be "so severe that no reasonable man could be expected to endure it." *Id.* (quoting *Restatement*

(Second) of Torts § 46, comment j); *Hume,* 178 N.J.Super. at 317–319, 428 A.2d 966.

New Jersey courts have found conduct constituting the intentional infliction of emotional distress where a physician, knowing it was false, told parents their son was suffering from cancer. *Hume v. Bayer,* 178 N.J.Super. 310, 428 A.2d 966 (Law Div.1981). A possible claim was also found where a hospital was unable to locate the body of a deceased baby for three weeks. *Muniz v. United Hospitals Medical Center Presbyterian Hospital,* 153 N.J.Super. 79, 379 A.2d 57 (App.Div.1977).

Based on this standard for outrageous conduct, federal courts have found a question of fact for the jury in the employment context where the employer subjected the employee to continuing sexual harassment or to continuing retaliation after the employee filed an age discrimination complaint. *See, e.g., Porta v. Rollins Environmental Services, Inc.,* 654 F.Supp. 1275, 1285 (D.N.J.1987), *aff'd without opinion,* 845 F.2d 1014 (3d Cir.1988); *Cory v. SmithKline Beckman Corp.,* 585 F.Supp. 871 (E.D.Pa.1984).

In contrast, continuing "petty vindictive behavior" by an employer in retaliation for the employee's public criticism of the employer's reorganization plan does not raise a question of fact for the jury. *Zamboni v. Stamler,* 847 F.2d 73, 80 (3d Cir.), *cert. denied,* 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988). Nor does conduct constitute the intentional infliction of emotional distress where the employer represented to the employee that the employee's job would remain secure following relocation of corporate offices and then terminated the employee. *Brunner v. Abex Corp.,* 661 F.Supp. 1351, 1359 (D.N.J.1986). A claim of wrongful discharge based on the employer's termination of the employee for allegedly refusing to cooperate in destroying documents will fail to meet the conduct standard as a matter of law, *Borecki v. Eastern International Management Corporation,* 694 F.Supp. 47, 49 (D.N.J.1988), as will an employer's decision to summarily terminate a sixty-year-old employee after

twenty-two years of employment. *Carney,* 701 F.Supp. at 1104.

In the instant case, Maietta alleges the conduct of Barbillon, Foster, Brown, as well as John Turi ("Turi") and Pat Dolan ("Dolan"), two Loss Prevention Supervisors who conducted a number of interviews during the Integrity Investigation, constitutes the intentional infliction of emotional distress. Maietta Dep. at 370. He admits the only contact he had with Barbillon and Foster was during the 18 October 1988 Integrity Investigation interview. Maietta Dep. at 371. He also admits his sole contact with Brown was during the 8 November 1988 meeting in Darden's office, during which he was terminated. He maintains, however, that Brown's conduct in heading up the Integrity Investigation constituted the intentional infliction of emotional distress. Maietta Dep. at 371. Maietta had no personal contact with Turi and Dolan. But he maintains their telling Bruce DeSousa, a UPS Center Supervisor, that Maietta had cheated and committed breaches of integrity constituted the intentional infliction of emotional distress. Maietta Dep. at 371.

■ Maietta testified repeatedly at deposition that neither Barbillon nor Foster screamed or yelled, touched or restrained him or verbally or physically threatened him with the use of force. *See supra,* at 1354–1355 and n. 13; Maietta Dep. at 62, 66, 75, 78, 80, 81. In his affidavit submitted to defeat summary judgment, Maietta changed his allegations to assert Barbillon raised his voice in a threatening manner. *See supra,* at 1354 n. 14. As noted above, Maietta may not create a genuine issue of material fact to defeat a summary judgment motion by submitting an affidavit contradicting his prior sworn testimony. *See Martin,* 851 F.2d at 705; *supra,* discussion, at 1359–1360.

Even accepting Maietta's new allegations as true, the conduct of Barbillon and Foster does not as a matter of law constitute the intentional infliction of emotional distress. No reasonable mind could find the sole act of raising one's voice in the context of an investigation into an employee's

wrongdoing "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir.1979); *Buckley*, 111 N.J. at 366, 544 A.2d 857.

■ Nor does the conduct of Brown, Turi and Dolan amount to such outrageous behavior. The organization and implementation of an investigation into the falsification of Volume Reports are acceptable business practices and are not outrageous beyond "all possible bounds of decency." *Id.* That Turi and Dolan stated the allegations against Maietta to a third party in the process of investigating the alleged wrongdoing does not change this result. Moreover, Maietta has not asserted he has suffered emotional distress "so severe that no reasonable [person] could be expected to endure it." *Buckley*, 111 N.J. at 366, 544 A.2d 857.

■ The New Jersey Supreme Court found in *Buckley* that aggravation, embarrassment, an unspecified number of headaches and loss of sleep do not constitute severe emotional distress, especially where the plaintiff has not alleged these conditions interfered with his daily routine. *Id.* at 368–69, 544 A.2d 857.

Maietta asserts that when he sees a UPS truck, he experiences the same feeling one has when one is "rejected by some ... love ... where your heart stops and you get sick to your stomach...." Maietta Dep. at 376. He feels despondent and humiliated. Maietta Aff., ¶¶ 139–40, Maietta Dep. at 393–94. He says he is unable to sleep properly. Maietta Aff., ¶¶ 139–40. However, Maietta has never sought medical or psychological assistance or therapy for these conditions. Maietta Dep. at 473, 479, 480, 487–88. He does not assert his conditions interfered with his ability to work. Maietta Dep. at 479, 492. He and his wife opened a store three months after his dis-

charge and operate it themselves. Maietta Dep. at 439, 450.

Maietta asserts in his affidavit submitted to defeat summary judgment that his "blood pressure has recently escalated to a point that doctors cannot control it with medication." Maietta Aff., ¶ 142. Rule 56(e) requires that an affidavit must be made "on personal knowledge," must set forth "such facts as would be admissible in evidence," and must "show affirmatively that the affiant is competent to testify to the matters stated therein." *Hlinka*, 863 F.2d at 282; *Maldonado v. Ramirez*, 757 F.2d 48, 50–51 (3d Cir.1985); *Baxter*, 712 F.Supp. at 1173–74. While Maietta may be able to testify concerning the elevated nature of his blood pressure, it does not appear he is competent to attribute a cause for its rise. Maietta is not competent to testify as to medical determinations concerning cause. This suggestion does not create a genuine issue of material fact to defeat summary judgment.[32]

Maietta also adds the assertion that his distress has made it "difficult for [him] to function normally on a day-to-day basis as a result of the grief I feel." Maietta Aff., ¶ 143. This assertion parallels the language of *Buckley*, where the court noted "Buckley does not claim any interference with his every day routine as a result of his mental distress." *Buckley*, 111 N.J. at 369, 544 A.2d 857. Rule 56 entitles a party asserting the absence of a genuine issue of a material fact to demand "at least one sworn averment of that fact before the lengthy process of litigation continues." *Schoch*, 912 F.2d 654, 657 (quoting *Lujan v. National Wildlife Fed'n*, —— U.S. ——, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

Maietta's conclusory assertion that it is difficult to function on a day-to-day basis is belied by his earlier testimony stating that there is nothing he was able to do prior to his discharge which is now unable to do. *See* Maietta Dep. at 484–85, 510. Maietta has not, as a matter of law, suffered distress of the severity required to sustain a

---

32. *See supra,* at 1355 n. 16 for references to discussions of other instances in which Maietta has made unsupported factual assertions to cre-

ate an issue of material fact and defeat summary judgment.

claim for the intentional infliction of emotional distress.

### G. Discrimination on the Basis of National Origin

■ The New Jersey Law Against Discrimination (the "LAD") provides in relevant part:

It shall be unlawful employment practice ... or ... unlawful discrimination:

a. For an employer, because of the ... national origin ... of any individual ... to ... discharge ... from employment such individual....

N.J.S.A. 10:5–12. Federal analysis utilized in claims under Title VII and the Age Discrimination in Employment Act ("ADEA") has been adopted by the New Jersey courts in analyzing claims brought under the LAD. *See, e.g., Erickson v. Marsh & McLennan Co.,* 117 N.J. 539, 569 A.2d 793 (1990); *Shaner v. Horizon Bancorp.,* 116 N.J. 433, 561 A.2d 1130 (1989); *Andersen v. Exxon Co., U.S.A.,* 89 N.J. 483, 446 A.2d 486 (1981); *Goodman v. London Metals Exch. Inc.,* 86 N.J. 19, 30, 429 A.2d 341 (1981); *Peper v. Princeton University Board of Trustees,* 77 N.J. 55, 81, 389 A.2d 465 (1978); *Giammario v. Trenton Bd. of Educ.,* 203 N.J.Super. 356, 361, 497 A.2d 199 (App.Div.), *cert. denied,* 102 N.J. 336, 508 A.2d 212 (1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1791, 90 L.Ed.2d 337 (1986).

The Supreme Court has recognized two separate theories of relief under Title VII: disparate treatment and disparate impact. In disparate treatment cases, an "employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, though it can in some situations be inferred from the mere fact of differences in treatment." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Claims of disparate impact involve "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of dis-

criminatory motive, we have held, is not required under disparate-impact theory." *Id.* (citations omitted). *Compare, e.g., Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) with *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–806, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973).

As mentioned, disparate impact cases allege that a facially neutral employment practice affects some groups more harshly than others. *International Brotherhood of Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. Maietta does not point to any facially neutral employment practice, but rather asserts Italians were singled out for harsher treatment than non-Italians. He thus alleges disparate treatment. *Cf. Bhandari v. AT & T, Inc. (Gunderson),* No. 85–1753, slip op., 1990 WL 13099 (D.N.J. 14 February 1990). ("[I]t is obvious that this is not a 'disparate impact' case. Plaintiffs do not point to any facially neutral employment practice.... Rather, they claim simply [their superiors] preferred female managers to male managers, and that they were terminated as a consequence of that preference.").

A plaintiff bears the ultimate burden of persuasion in a disparate treatment case to show his treatment was "caused by purposeful or intentional discrimination." *Massarsky v. General Motors Corp.,* 706 F.2d 111, 117 (3d Cir.) (quoting *Smithers v. Bailar,* 629 F.2d 892, 898 (3d Cir.1980), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). *See also Jalil v. Avdel Corp.,* 873 F.2d 701, 707 (3d Cir.1989); *Logue v. Internat'l Rehabilitation Associates, Inc.,* 837 F.2d 150, 153 (3d Cir.1988). But because it is difficult in disparate treatment cases for the employee to obtain direct evidence of the employer's motive, the employee is permitted to establish a *prima facie* case. *Chipollini v. Spencer Gifts,* 814 F.2d 893, 897 (3d Cir.1987); *Massarsky,* 706 F.2d at 118; *Baxter,* 712 F.Supp. at 1172. Once the *prima facie* case is established, the burden of production shifts to the employer to show a legitimate, non-discriminatory reason for its treatment of the employee. It is then incumbent on the employee to prove the asserted reason for

the discharge is pretextual. *Jalil,* 873 F.2d at 706–07; *Levendos v. Stern Entertainment, Inc.,* 860 F.2d 1227, 1229 (3d Cir. 1988); *Massarsky,* 706 F.2d at 118 (citing *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253–55, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824). *See also Turner v. Schering–Plough Corp.,* 901 F.2d 335, 342 (3d Cir.1990).

In analyzing claims of discriminatory discharge under the LAD, the New Jersey Supreme Court has adopted the application of *Burdine* and *McDonnell Douglas* employed by the First Circuit for claims of discriminatory discharges under Title VII. *Clowes v. Terminix Intern'l, Inc.,* 109 N.J. 575, 597, 538 A.2d 794 (1988) (citing *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1013 (1st Cir. 1979)). Under this analysis, the employee has established a *prima facie* case for a discriminatory discharge where the employee proves: (1) the employee was a member of a protected group; (2) the employee was performing his job at a level that met his employer's legitimate expectations; (3) the employee nevertheless was fired; and (4) the employer sought someone to perform the same work after the employee was terminated. *Id.* 109 N.J. at 597, 538 A.2d 794.

The *Loeb* court pointed out that the employee need only prove he was replaced, thereby demonstrating a continued need for the same services. *Loeb,* 600 F.2d at 1013. But it also noted that evidence that the replacement was not a member of the protected group may be probative of discrimination. *Id.* at 1013 n. 9. *See also Turner,* 901 F.2d at 342 (in claim under ADEA and the LAD, plaintiff must show that he is in protected class and that he is qualified, but also that he was replaced by "person sufficiently younger to permit an inference of age discrimination.").

In the instant case, Maietta has submitted no evidence that UPS had a discriminatory motive for terminating his employ-

ment. He cites a comment made by a former superior Frank Foley around 1972, and comments made by subordinates that UPS did not hire or promote sufficient Italians. Maietta Dep. at 8, 13–14, 18. These comments were made most recently in 1982, by people who he does not assert participated in the decision to terminate his employment. He asserts he was called derogatory ethnic names, but does not say by whom or when. Maietta Aff., ¶ 135. He testified he never knew a UPS managerial employee to express in words or substance the view that there were too many Italians employed by UPS. Maietta Dep. at 41. He was never told by anyone and never heard from anyone that the decision to discharge him had anything to do with his Italian heritage. Maietta Dep. at 28–29.

Maietta argues he has established a prima facie case for a discriminatory discharge because (1) he is a member of a protected group; (2) he was terminated from a job for which he was qualified; and (3) his job was filled by an individual not belonging to the protected class. Maietta Brief at 31. Maietta asserted in his affidavit: "On information and belief, Glenn Henry took over my job responsibilities as Newark Center Manager subsequent to my discharge...." Maietta Aff., ¶ 37. Representations made on information and belief will not suffice to create an issue of material fact to defeat summary judgment. *See Williams v. West Chester,* 891 F.2d 458, 471 (3d Cir.1989); *Hlinka,* 863 F.2d at 281; *Hurd v. Williams,* 755 F.2d 306, 308 (3d Cir.1985).[33] This is especially true here, where UPS submitted evidence to the contrary in the form of the affidavit of Frank Lupo, stating that it is he who replaced Maietta and that he, Lupo, is of Italian heritage. *See* Lupo Aff.

Maietta has failed to make out a *prima facie* case for discriminatory discharge because he has not shown he was qualified for the job in light of his misconduct, the falsifying of reports. As discussed above, UPS had as a matter of law good cause for

---

**33.** *See supra,* at 1355 n. 16 for references to discussions about other instances in which Maietta has made unsupported factual asser-

tions to create an issue of material fact and defeat summary judgment.

**1372**

terminating Maietta. Moreover, the LAD does not "prevent the termination ... of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, nor to preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards...." *Clowes*, 109 N.J. at 600, 538 A.2d 794 (quoting N.J.S.A. 10:5–2.1). The Maietta Brief and supporting documents make no attempt to show or argue that UPS' asserted reason for discharging Maietta was pretextual.

To his claims in the Second Amended Complaint and deposition, Maietta added in his affidavit that the plurality of employees terminated as a result of the Integrity Investigation were of Italian descent. Maietta Aff., ¶ 137. He argued in his Brief that seven of the fifteen individuals terminated as a result of the Integrity Investigation are of Italian descent and argues this constitutes a "disparate impact upon Italians", and is thus further evidence of discharge based on national origin. Maietta Brief at 31.[34]

Disparate treatment may sometimes be demonstrated through statistical proofs. However, their usefulness depends on all of the surrounding facts and circumstances. *International Brotherhood of Teamsters*, 431 U.S. at 339–40, 97 S.Ct. at 1856–57; *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1219–20 (3d Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 2449, 104 L.Ed.2d 1004; *Bhandari v. AT & T (Gunderson)*, No. 85–1753, slip op. (D.N.J. 14 February 1990) (terminated male district manager's assertion that no female district managers were terminated was misleading, given that over 70% of the district managers were male and that plaintiff provided no evidence to show that terminated district managers were as qualified as female district managers who were retained). Maietta has provided no proof of the surrounding circumstances for his assertion.

His assertion that a plurality of those discharged were of Italian descent is therefore not probative as to whether Italian–Americans were accorded disparate treatment by UPS.

Thus, Maietta has failed as a matter of law to support his claim that his discharge was done in violation of the LAD.

*Conclusion*

For the foregoing reasons, summary judgment is granted in favor of UPS and against Maietta, and Counts One, Two, Three, Four and Eight of Maietta's Second Amended Complaint are hereby dismissed. Because Maietta has voluntarily withdrawn Counts Five, Six and Seven, the entire Second Amended Complaint is dismissed. An appropriate order accompanies this opinion.

---

**34.** The assertion in the Maietta Brief that seven of the fifteen individuals discharged following the Integrity Investigation were of Italian descent is not probative, as it is unsupported by an affidavit based on personal knowledge as required by Rule 56(e) and is merely counsel's assertion in a legal memorandum. *Schoch v. First Fidelity Bankcorp.*, 912 F.2d 654, 657–58.